## Commonwealth *v.* Hoover, Appellant.

*Sunday law—Worldly employment—Purchase of cigar—Act of April 22, 1794.*

The purchase of a cigar on Sunday for the purpose of consumption is not a worldly employment or business within the meaning of the Sunday law of April 22, 1794.

Argued March 8, 1904. Appeal, No. 17, Oct. T., 1904, by defendant, from judgment of Q. S. Phila. Co., affirming summary conviction before a magistrate in case of Commonwealth v. Albert J. Hoover. Before RICE, P. J., BEAVER, ORLADY, SMITH, PORTER, MORRISON and HENDERSON, JJ. Reversed.

Appeal from summary conviction.

The facts appear by the opinion of MARTIN, P. J., which was as follows:

Albert J. Hoover, the defendant, was arrested upon a warrant charging him with a violation of the act of 1794, relating to worldly employment on Sunday. After hearing, he was convicted, and subsequently appealed.

It appears from the magistrate's transcript that the testimony produced at the hearing proved that the defendant, in the county of Philadelphia, " on Sunday, October 18th, 1903, while agent for a society, bought a cigar."

It was claimed at the argument that, while selling a cigar was within the prohibition of the law, that its terms did not extend to buying; and that defendant, when making the purchase, having acted as a detective employed to convict sellers,

if he was performing worldly employment or business, his work was one of necessity within the exception contained in the act.

Sunday legislation is more than fifteen centuries old, and the "historic argument" is of value in construing the existing law.

"All Sunday legislation is the Product of Pagan Rome; the Saxon laws were the product of Middle Age legislation of 'The Holy Roman Empire.' The English laws are the expansion of the Saxon, and the American are the transcript of the English:" Lewis' History of Sunday Legislation, p. 70.

The first Sunday law, the edict of the Emperor Constantine, was the product of that pagan conception developed by the Romans, which made religion a part of the state. The day was to be venerated as a religious duty owed to the God of the Sun.

During the Middle Ages, the civil authorities exercised the right to legislate in religious matters after the manner of Jewish Theocracy. The English Reformation introduced, for the first time, the doctrine of the Fourth Commandment to the first day of the week. While Christianity is part of the common law of this state (Updegraph v. Commonwealth, 11 S. & R. 394; Sparhawk v. Union Passenger Railway Co., 54 Pa. 401), it was said by REED, J., in the latter case (p. 443), "Judge BELL, in Specht v. Commonwealth, 8 Barr, 325, puts the Sunday law on its true basis. 'Its sole mission is to inculcate a temporary weekly cessation from labor, but it adds not to this requirement any religious obligation.'"

Chief Justice LOWRIE, in Commonwealth v. Nesbit, 34 Pa. 403, 409, after referring to the earlier legislation in this commonwealth and to the English act of 29 Charles II, chap. VII, upon which our laws were in a great measure modeled, said: "Let us consider the statutory definition of what is forbidden. It is 'any worldly employment or business whatsoever.' What does this word 'worldly' mean? Its correlatives help us to its meaning. Very evidently worldly is contrasted with religious, and all worldly employments are prohibited for the sake of the religious ones."

Reference to "buying" in terms, is of rare occurrence in the laws. Perhaps the earliest appearance of the word is in the enactment by the Council of Mayence, in 813 A. D., under

Charlemagne, which decrees "that all Lord's days shall be observed with all due veneration, and that all servile work shall be abstained from, and that buying and selling may be less likely to happen, there shall be no judicial trials, unless concerning capital crimes." The Council of Rheims "prohibited on the Lord's day any mercantile transaction:" Lewis' Hist. Ibid. p. 66. In one of the laws of Edward the Elder, made after the peace between the Danes and English, it was provided that "if any one engaged in Sunday marketing, let him forfeit the chattel," and pay a fine; and in the reign of Aethelstane, it was enacted "that no marketing be on Sunday:" Ibid. 73. Among the laws of Edgar was one "that enjoined that Sunday trading be abstained from" (Ibid. 74), and laws similar in character were enacted in the reign of Ethelread and also that of Canute: Ibid. 129.

The Cromwellian Parliament passed an act in 1656 in which persons who were "in any tavern, any ale-house, victualing-house, strong-water-house, tobacco-house, cellar or shop, they not lodging there (and only upon urgent necessity to be allowed by a justice of the peace), or fetching or sending any wine, ale or beer, tobacco, strong-water or other strong liquor unnecessarily, and to tipple within any other house, shall be deemed guilty of prophaning the Lord's day." In the same act, it was provided that every butcher killing any cattle, coffer-monger, poulterer, herb-seller, cord-wayner, shoemaker, or other person, selling, disposing or offering to sell any of their wares or commodities, and the person buying said wares or commodities, shall be deemed guilty of profaning the Lord's day: Lewis' Hist. p. 129.

In the statute of 29 Chas. II, chap 7, the subject was forbidden from "exercising his ordinary calling or business" on Sunday; and its wording was adopted in the act of 1705, passed in this commonwealth: Com. v. Nesbit, 34 Pa. 403, 409, supra. The act of 1794, however, contains a prohibition against "any worldly employment or business whatsoever on the Lord's day," and enumerates the exceptions.

As was said in the case of Duncan v. Commonwealth, 2 Pearson, 213, "It matters not whether it is the person's ordinary calling or business or not. . . . The old act of 1705 in this particular was copied from the act of Charles II, already cited, but

after the construction put on these words by the learned court of Great Britain, our legislators in passing the act of 1794, as we conceive, purposely changed the wording. They saw that the blacksmith might leave his shop and work on Sunday at making garden or building fences, "it was not his ordinary calling," they therefore forbade " any worldly employment whatsoever."

In this same case, it was said (p. 215), " We are unable to see why the buyers, as well as the sellers, are not offenders against the law, both are doing worldly business." It is claimed, however, that the act of the defendant was one of necessity in order to produce evidence of the offense by the seller.

In the earliest law upon the observation of Sunday, which seems to be the Edict of Constantine, heretofore referred to, and which is quoted in the opinion of Judge REED in Sparhawk v. Union Passenger Railway Co., supra, there was a mandate to all judges, and all city people, and all tradesmen, to rest on the venerable Day of the Sun, but the work of necessity excepted, permitted those dwelling in the country, freely and with full liberty, to attend to the culture of their fields, since it frequently happens that no other day is so fit for the sowing of grain or the planting of vines ; hence the favorable time should not be allowed to pass, lest the provisions of Heaven be lost."

In the year 858 A. D., Pope Nicholas I, in his instruction to the Burgundians that had lately embraced Christianity, taught them that there were no days on which works of necessity, such as journeying, fighting, etc., might not be performed: Lewis' Hist. Ibid. 67.

It was stated by Chief Justice LOWRIE, in Commonwealth v. Nesbit, supra, in construing the words of the act of 1794 : " Some worldly employments are expressly allowed, such as removing one's family, the delivering of milk and the necessaries of life, and the business of ferrymen and inn-keepers, and, of course, these may be performed by a person or his servants and by all the ordinary means adopted for this purpose and which are not in themselves forbidden, and all worldly employments are allowed which in their nature consist of acts of necessity or charity ; or if they become so for the time being by reason of famine, flood, fire, pestilence or other disaster. . . . The law regards that as necessary which the common sense of the country in its ordinary modes of doing its business regards as necessary."

Accepting in its broadest sense the definition of works of necessity as used in connection with Sunday legislation, it is not possible to conceive of a necessity which compels a person to become a party to an offense which is susceptible of proof upon view. That it may be more convenient for an informer to buy than to wait for a precarious customer, cannot make the work one of necessity.

The defendant was properly convicted, and the judgment of the magistrate is affirmed, and the appeal dismissed at the cost of the appellant.

*Error assigned* was the judgment of the court.

*Wm. Morgan Montgomery,* with him *W. V. Collier,* for appellant, cited: Com. v. Nesbit, 34 Pa. 403; Duncan v. Com., 2 Pearson, 213; Campbell v. Com., 84 Pa. 187; People v. Noelke, 94 N. Y. 137; People v. Farrell, 30 Cal. 316; State v. McKean, 36 Iowa, 343; Wharton's Criminal Evidence (9th ed.), 1884, sec. 440; People v. Farrell, 30 Cal. 316; People v. Barric, 49 Cal. 342; People v. Krivitzky, 168 N. Y. 182 (61 N. E. Repr. 175); Doyle v. Lynn, etc., R. Co., 118 Mass. 195; McClary v. Lowell, 44 Vt. 116; Bucher v. Cheshire R. R. Co., 125 U. S. 555 (8 Sup. Ct. Rep. 974).

*Owen J. Roberts,* assistant district attorney, with him *John C. Bell,* district attorney, for appellee, cited: Duncan v. Com., 2 Pearson, 213; Kepner v. Keefer, 6 Watts, 231; Com. v. Holstine, 132 Pa. 357; Com. v. Weiss, 139 Pa. 247; Commonwealth v. Goodman, 97 Mass. 117; Commonwealth v. Raymond, 97 Mass. 567; Commonwealth v. Emmons, 98 Mass. 6; Commonwealth v. Wentworth, 118 Mass. 441; State v. White Oak River Corporation, 111 N. Car. 661 (16 S. E. Repr. 331); State v. McLean, 121 N. Car. 589 (28 S. E. Repr. 140).

OPINION BY SMITH, J., May 11, 1904:

The prosecutor in this case, having been convicted on an information made by the defendant, of violating the act of April 22, 1794, commonly known as the "Sunday Law," by selling a cigar to the defendant, now charges the latter with having violated the same act by purchasing the cigar.

The act of 1794 forbids the performance of " any worldly employment or business whatsoever on the Lord's Day, commonly called Sunday, works of necessity and charity only excepted." Since the purchase of a cigar cannot be deemed a work of necessity or charity, the primary question here is whether it subjects the purchaser to the statutory penalty.

While a sale on Sunday, not a work of necessity or charity, is a violation of the act, it by no means follows that the purchaser is involved in this violation. A guide to the legislative view on this point may be found in the general course of legislation in the exercise of the police power. The state has forbidden various things, as against public policy. Among these are the sale of lottery tickets, of certain drugs and nostrums, of obscene literature, of academic degrees and diplomas, of liquor on Sunday and on election day, and to minors, persons of known intemperate habits, and persons intoxicated, and at any time, or to any person, except by persons duly licensed; it has also prohibited the maintenance of gambling houses or devices, fortune-telling, horse-racing, book-making, etc. But in this legislation the penalty has been aimed at the person making the sale or furnishing the forbidden appliances or means; the person taking part in the transaction only as a purchaser or patron has not been regarded as particeps criminis, though the violation of law has been due largely to demand on his part. There are, indeed, instances in which his act, when in the nature of a public nuisance, or tending peculiarly to the degradation of morals, has been made a substantive offense. Thus, section 3 of the act of 1705–6 imposes a penalty on persons " found drinking or tippling in ale houses, taverns, or other public house or place " on Sunday, as well as on the keepers of such places " who countenance or tolerate any such practices; " and the act of June 10, 1885, imposes a penalty not only on the keepers of opium joints, but on persons found therein smoking or otherwise using opium. But such apparent exceptions rest on grounds essentially different from those on which the other statutory prohibitions mentioned are based.

Applying to the act of 1794 the rule as to legislative intent in the imposition of penalties, clearly deducible from the general course of legislation in the exercise of the police power,

we must construe that act as intending the accomplishment of its purpose, as in the great body of statutory prohibitions, by imposing the penalty on the person who supplies another contrary to its provisions, and not on the person whom he supplies. It follows, therefore, that the defendant in the case before us is not subject to the penalty.

A consideration of the question from another point of view will lead to the same conclusion as to the liability of the defendant. Among the laws for the government of the province, agreed on in England, May 5, 1682, was a provision that on " every first day of the week, called the Lord's day, people shall abstain from their common daily labor." The first provincial statute, passed December 7, 1682, provided that on this day " people shall abstain from their usual and common toil and labor ; " and this was re-enacted in the same language November 27, 1700. A more elaborate act on this subject was passed January 12, 1705–6, in which the corresponding provision was that " all people shall abstain from toil and labor," and that " no tradesman, artificer, workman, laborer, or other person whatsoever, shall do or exercise any worldly business or work of their ordinary callings, works of necessity and charity only excepted." The act of 1794 enlarged the prohibition to include " any worldly employment or business whatsoever," not of necessity or charity. The purpose of these enactments was to enforce a cessation of the usual affairs of life, in labor and business, on Sunday, by punishing the person engaging therein. To determine the application of the penalty, under the act of 1794, it is necessary to define the nature of the offense, and ascertain what is implied in the words " employment " and " business," as used in that act. A person who sells is undoubtedly employed in business. But, whatever may be said of purchases for subsequent sale or use in the course of any calling, it has never before been suggested in a court of law, in this state, that a casual purchase, for consumption, like that shown in the present case, is an employment or business. There is no authority, legal or linguistic, for this view ; and such expressions of judicial opinion as may be found are wholly inconsistent with it. In Bennett v. Brooks, 91 Mass. 118, it was said, in construing the Massachusetts statute forbidding " any manner of labor, business or work " on Sunday,

that the prohibition was not to be carried further than " to restrain the exercise of all those occupations or employments which make up the common daily business of mankind," and " all business which might fairly be deemed an employment or calling carried on for purposes of gain or profit." In Goddard v. Chaffee, 84 Mass. 395, it was said of " business," that it " denotes the employment or occupation in which a person is engaged to procure a living." In the common understanding of mankind, " business," " occupation " or " employment," is regarded as something engaged in with a view to compensation or profit; and this must be deemed the legislative view of " worldly employment or business " as used in the act of 1794. Assuredly, there can be no such view in a purchase of the character of that made by the defendant in this case. In making such a purchase, therefore, the purchaser cannot be held to have been engaged in the performance of any employment or business, within the meaning of the act of 1794. Hence he is not liable to the penalty imposed by that act.

The conclusion reached on these points is entirely consistent with the trend of judicial construction of the act of 1794, and makes it unnecessary to consider the other questions raised.

The animus of the prosecution in this case is obvious. The evident purpose is to discourage the enforcement of the act of 1794 by subjecting the prosecutor to the penalty for its violation. The growing tendency to disregard the observance of Sunday is much to be regretted, and it is this that should be discouraged. The courts cannot, through the strained and unwarranted construction contended for by the prosecutor here, countenance an attempt to nullify the statute by holding its penalty in terrorem over those who would give it effect. While the act remains on the statute book, it is the duty of the courts to construe it in accordance with the legislative intent uniformly shown in the exercise of the police power, and in such a spirit as to facilitate instead of defeat its enforcement.

Judgment reversed.